**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
RALPH FARINO,

                                 Petitioner,

                -against-

ROBERT E. ERCOLE, Superintendent,
Greenhaven Correctional Facility,

                               Respondent.
-------------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
07CV3592 (ADS)

**APPEARANCES**

**LANGONE & ASSOCIATES PLLC**
Attorneys for the petitioner
3601 Hempstead Turnpike
Suite 410
Levittown, NY 11756
      By:    Richard M. Langone, Esq., Of Counsel

**THOMAS J. SPOTA**
Suffolk County District Attorney
Attorney for the respondent
Criminal Courts Building
200 Center Drive
Riverhead, NY 11901
      By:    Michael J. Miller, Assistant District Attorney

**SPATT, District Judge.**

Presently before the Court is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Ralph Farino ("Farino or the "petitioner"). For the reasons that follow, this petition is denied.

## I. BACKGROUND

### A. Procedural History

Ralph Farino petitions this court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. The petitioner seeks relief from his April 4, 2002 conviction after a trial by jury in the New York Supreme Court, Suffolk County, of murder in the second degree (Penal Law § 125.25(2), also known as depraved indifference murder) and arson in the second degree (Penal Law § 150.15). The charges arose from the March 2, 2001 death of Claudia Broder ("Claudia"), Farino's mother-in-law. Following his conviction, the petitioner was sentenced to twenty-five years to life on the murder charge and a ten-year determinate sentence for arson, both counts to run consecutively.

Through counsel, the petitioner filed a direct appeal from the conviction. On appeal, he argued that (1) the court erred when both intentional murder and depraved indifference murder counts were submitted to the jury given that the evidence pertaining to depraved indifference murder was legally insufficient; (2) the petitioner was denied a fair trial; and (3) he was given an excessive sentence. The New York Appellate Division, Second Department, affirmed petitioner's conviction on August 8, 2005, *People v.*

*Farino*, 21 A.D.3d 427, 800 N.Y.S.2d 194 (2d Dep't 2005). The court wrote that

Farino's claims regarding instructing the jury on both intentional murder and depraved

indifference murder and the insufficiency of the evidence were unpreserved for appellate

review. Accordingly, the court declined to reach those issues. The court also stated that

trial counsel failed to preserve the contention that prejudicial errors were made by

prosecution on summation. As to the only issue preserved for appeal, the court ruled that

the jury instructions clearly stated to the jury that the burden of proof was on the People

and did not shift to the defendant. The Appellate Division also determined that the

sentence was not excessive.

      The New York State Court of Appeals denied Farino's application for leave to

appeal on October 27, 2005, *People v. Farino*, 5 N.Y.3d 852, 840 N.E.2d 141, 806

N.Y.S.2d 172 (2005) (table). Thereafter, the Appellate Division denied the petitioner's

*coram nobis* petition on December 26, 2006 seeking to vacate his conviction because

Farino failed to establish that he was denied the effective assistance of appellate counsel.

*People v. Farino*, 35 A.D.3d 879, 825 N.Y.S.2d 378 (2d Dep't 2006). The Court of

Appeals later denied leave to appeal that decision on May 1, 2007. *People v. Farino*, 8

N.Y.3d 984, 869, N.E.2d 663, 838 N.Y.S.2d 487 (2007).

      On August 27, 2007, the petitioner filed the present petition under 28 U.S.C. §

2254. On July 28, 2008, with authorization of the Court and consent of the Suffolk

County District Attorney, petitioner filed an amended § 2254 petition. In the amended

petition Farino contends: (1) that the evidence was legally insufficient to convict him of depraved indifference murder; (2) that petitioner's Due Process and Equal Protection rights were violated because the trial court did not apply full retroactive application of *People v. Suarez*, 6 N.Y.3d 202, 844 N.E.2d 721, 811 N.Y.S.2d 267 (2005), and *People v. Feingold*, 7 N.Y.3d 288, 852 N.E.2d 1163, 819 N.Y.S.2d 691 (2006); and (3) that the petitioner's appellate counsel was ineffective on direct appeal because he failed to raise a preserved and meritorious *Batson* claim pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Initially, the petitioner claims that the evidence produced at trial was insufficient to support a conviction for depraved indifference murder because the prosecution did not prove every element of that crime beyond a reasonable doubt. As well, the petitioner claims that trial counsel's general motion to dismiss preserved the issue for habeas review and that a specific objection by defense counsel would not have dismissed the case because it was customary practice at the time for depraved indifference murder charges to be presented to a jury in one-on-one altercations. Lastly, the petitioner asserts that the law when he was convicted prevented counsel from arguing more specifically that evidence of depraved indifference murder was legally insufficient.

The petitioner explains that recent State court decisions have changed the elements of depraved indifference murder. The narrowing of the categories potentially excludes the conduct for which the petitioner was tried and convicted. In *People v.*

4

*Suarez*, 6 N.Y.3d 202, 844 N.E.2d 721, 811 N.Y.S.2d 267, the court changed the categories in which depraved indifference murder could be used, particularly in one-on-one crimes. In *People v. Feingold*, 7 N.Y.3d 288, 852 N.E.2d 1163, 819 N.Y.S.2d 691, the court ruled that "depraved indifference," rather than "recklessness" was the required mental element of that crime. The petitioner states further that the court should apply both of these precedents to his current petition.

Petitioner lastly contends that the appellate counsel provided ineffective assistance by not raising a meritorious *Batson* issue on appeal. The petitioner argues that the prosecution struck several prospective minority jurors with racial bias. The trial court ruled that the prosecutions' explanations were satisfactory and race neutral. The petitioner alleges that since a *Batson* violation is a structural error that can never be harmless, counsel's failure to raise it on appeal amounts to ineffective assistance.

**B.    Factual Background**

On March 2, 2001, petitioner Ralph Farino killed his mother-in-law, Claudia Broder in her son's basement bedroom. The victim was repeatedly struck in the head with a baseball bat while Farino was high on cocaine, marijuana and alcohol. After placing Claudia's body in a storage bin and disposing of it at a remote location, the petitioner returned to ignite fire to the house using gasoline as an accelerant. At the time, the petitioner lived with his wife, Charity Broder, at the Broders' home. The petitioner claims to have been extremely stressed at the time of the incident and using drugs heavily

5

because he believed that his wife was having an affair and may have been impregnated by another man. At trial, the petitioner maintained that he had not committed the crimes and was forced to dispose of Claudia's body and burn the house by three unidentified intruders who murdered the victim.

## C.     Salient Testimony

### 1.     Evidence Regarding the Circumstances of the Attack

#### a.     Testimony of Dr. James Wilson

Dr. James Wilson testified as the medical examiner. (Tr. 2559). Dr. Wilson testified that he was called to the scene where Claudia Broder's body was found. (Tr. 2566). He stated that there were severe injuries to the head region and in the area of the forearms and hands. (Tr. 2566). There was also a lot of blood loss. (Tr. 2566).

Dr. Wilson testified that when Claudia's body was brought back to the medical examiner's office he observed evidence of very severe injuries, particularly in the region of the head. (Tr. 2569). He stated that there were also blunt traumatic injuries to the forearms and hands as well as the upper torso. (Tr. 2569–2570). In addition, Dr. Wilson testified that the injuries were characteristic of an object—like a baseball bat—that is capable of impacting against the body with force. (Tr. 2571). Dr. Wilson described the wounds on Claudia's forearms and hands as defensive wounds due to their location. (Tr. 2574–2575).

Dr. Wilson further testified that the right side of Claudia's face was discolored

and caved in. (Tr. 2575). The entire right side of the head was red to purple discolored and had fragmented fractures of the skull. (Tr. 2576). The right side eye globe was ruptured from a blow and there were tears through the skin on the right side of the head because of multiple, hard strikes. (Tr. 2576). The broken bones were tearing through the skin from hitting impacts. (Tr. 2576).

Dr. Wilson also stated that Claudia's nose was broken and that there was an impact site on the left side of her face with a large tear of the left eye and bruises on the left check. (Tr. 2576). Also, he found multiple fragmented skull fractures and fractures in the right side of the face. (Tr. 2580). Dr. Wilson also testified that a large fracture "extended up from the right side, across the midline to the left, which was a single linear fracture." (Tr. 2580). There was also a break on the right side of the jaw over to the left side of the chin. (Tr. 2580). He went on to state that the brain itself had multiple signs of injury. (Tr. 2581). He explained that the brain injuries indicated that there were several blows struck to the right side of the head with large amounts of energy used. (Tr. 2581). Also, there was a fractured bone in the left forearm. (Tr. 2581).

Dr. Wilson described how, in his opinion, Claudia's body was positioned when she received the blows. (Tr. 2583). He explained that the blows to the hands and forearms may have been received in a variety of positions. (Tr. 2583). He opined that the shoulder blows occurred while the blunt object was aimed at the head. (Tr. 2583). Dr. Wilson went further to explain that the severe injuries on the right side of the head

occurred while Claudia was on the ground.  (Tr. 2583).  He testified that Claudia's face was exposed with nothing protecting her face while she received the multiple blows.  (Tr. 2584).

Dr. Wilson testified that dental records identified Claudia's body because he did not believe visual identification would be sufficient.  (Tr. 2577).  He further testified that after examining the pictures and reviewing his report, he believed that Claudia received "20 or more blows, at least."  (Tr. 2582).

### b.    Testimony of Donald Dollar

Donald Dollar testified that he is employed by the Suffolk County Crime Lab and did a walk-through to collect forensic evidence at the Broder home.  (Tr. 1586–1589).  He stated that while doing a walk-through he found a large pool of what appeared to be blood in the center of a bedroom in the basement.  (Tr. 1605).  He also stated that he found what appeared to be blood stains on various items throughout the room as well.  (Tr. 1606).  Dollar also said that he found blood stains on the underside of a table in the room, the pole in the center of the legs of the table, a television stand and television, paneling along the wall, as well as the wall itself.  (Tr. 1609-1611).  Stains of what appeared to be blood were also collected on the ceiling.  (Tr. 1614).

### c.    Testimony of Detective Thomas Farrell

Detective Thomas Farrell testified that he was assigned to the Arson Squad at the time of the incident in question.  (Tr. 1346).  During his testimony a video was shown in

which he pointed out blood splatters in the room on the walls and ceiling. (Tr. 1375). Detective Farrell later testified that he also found an area of the carpet in the basement bedroom, which had red liquid that later tested to be human blood. (Tr. 1439).

### 2. Testimony of the Petitioner's Pre-Attack Activities

#### a. Testimony of Detective Daly

Detective Daly testified that when Farino was arrested and placed in the back seat of the police car he questioned him regarding the events that lead to the death of Claudia Broder. (Tr. 2261–2264). Detective Daly stated that while questioning the petitioner in the car, he admitted to having "blackouts" recently and that he did not know why. (Tr. 2264). The Detective then asked if the "blackouts" were because of too much drug use, to which the petitioner replied, "maybe." (Tr. 2264).

While testifying, Detective Daly read the written statement signed by the petitioner. (Tr. 2232). The statement said that the petitioner was driving around from about 5:00 a.m. because he was wired up from ingesting cocaine after work on the night of March 1, 2000. (Tr. 2233).

#### b. Testimony of Charity Broder

The petitioner's wife, Charity Broder, stated that towards the end of January 2001, Farino told her that he was using different types of drugs. (Tr. 2639–2643). She further stated that Farino told her he was using angel dust and she was aware of Farino's use of cocaine. (Tr. 2643). Charity Broder also testified that the petitioner's drug

problem was an open fact since January or February of 2001. (Tr. 2696). She had

separated from the petitioner in March of 2000 because he was using a lot of marijuana.

(Tr. 2635, 2707). She also stated that the petitioner's drug use started after his brother's

death in June of 2000. (Tr. 2697-2701).

c. Testimony of Robert Broder

Robert Broder testified as the husband of Claudia and that he lived in the same

house as Claudia and the petitioner. (Tr. 1994, 1999). He testified that he knew that the

petitioner had a problem with drugs. (Tr. 2020). Broder also stated that he was

personally involved in Narcotics Anonymous and that he had conversations with the

petitioner about the problems involving his drug use. (Tr. 2020–2021).

d. Petitioner's Testimony

The petitioner testified that he had ingested different types of drugs and alcohol

throughout the night of March 1, 2001 after he left work. (Tr. 2913–2915). Farino

testified that he withdrew between three hundred dollars and four hundred dollars from

his wife's bank account to purchase cocaine. (Tr. 2913). The petitioner testified that

when he left work at midnight he did cocaine and went straight to a bar where he drank

beer and liquor for about forty-five minutes. (Tr. 2915). The petitioner stated that he

received a marijuana cigarette from an acquaintance he knew at the bar. (Tr. 2915). The

petitioner also testified that after leaving the bar, he met with an old friend to smoke a

few cigarettes for about forty-five minutes and then picked up a twelve pack of beer and

an "oil can" of beer (twenty ounces).  (Tr. 2917–2918).  After picking up the alcohol the

petitioner stated he drove around for "a little bit" before heading home.  (Tr. 2918).

Farino went on to state that when he went home he barricaded himself in the living room

and did cocaine, drank, and smoked marijuana and cigarettes for the rest of the night.

(Tr. 2919).

Farino testified that he took his wife's cell phone to call some of her friends to

talk about the problems they were having in their relationship.  (Tr. 2920).  Farino stated

that he made a few calls and reached his wife's co-worker, Anna Gios.  (Tr. 2922).  The

petitioner went over to Gios' house and had breakfast there but did not talk about the

problems in his marriage that were bothering him.  (Tr. 2922–2923).  The petitioner

testified that he left Gios' house and upon returning home got into an argument with his

wife.  (Tr.  2923–2924).  After the argument, the petitioner stated that he was "pretty

messed up . . . from the previous night into the morning and wasn't feeling too well," so

he laid down.  (Tr. 2927).

The petitioner stated that when he got up to take a shower that morning he noticed

a champagne colored car outside.  (Tr. 2930).  Farino testified that after he got out of the

shower he also saw a white van parked out front with a co-worker of Claudia Broder.

(Tr. 2931).  Farino testified that he went outside and talked with Claudia's co-worker,

who was waiting for her, and then came inside to look for her.  (Tr. 2932).  The petitioner

testified that he again went outside to inform the co-worker he could not find Claudia.

(Tr. 2932–2933).  The petitioner went on to testify that he thinks he did more cocaine before laying down for a short time.  (Tr. 2934).  Farino further testified that he got up again to call his wife to apologize for fighting with her earlier that morning and did a little more cocaine.  (Tr. 2936).  The cocaine made him feel sick again, so he laid down once more.  (Tr. 2936).  Farino stated that he was still high while he was lying down when he heard a noise from the unidentified intruders.  (Tr. 2936).

In his testimony, the petitioner additionally stated that he was addicted to cocaine during this time period, (Tr. 3021) and for the previous months before the homicide he was using cocaine and marijuana.  (Tr. 2905).  Farino further stated that everyone in the household had knowledge of his drug use and had spoken with him separately about his drug addiction.  (Tr. 2906).

### 3.   The Relationship between the Petitioner and Claudia Broder

#### a.   Testimony of Charity Broder

Charity Broder testified that the petitioner did not have any animosity towards Claudia but had a problem with how Claudia handled the issues with Jacob, Claudia's son.  (Tr. 2655–2656).  She further testified that Claudia took care of her family including the petitioner when he moved into Claudia's home.  (Tr. 2696).  Charity Broder also stated that Claudia and the petitioner confided in each other with regard to the petitioner's drug problem and other problems he had.  (Tr. 2697).

### b.      Testimony of Robert Broder

Robert Broder testified that he resided in the same household with the petitioner and Claudia Broder.  (Tr. 1991).  He also stated that Claudia was his primary care giver due to a stroke several years before.  (Tr. 1991–1992).  Broder testified that the petitioner spoke with Claudia and himself about problems with drugs use.  (Tr. 2020–2021).  He went on to state that the petitioner spoke with Claudia about other problems he was having as well.  (Tr. 2021).

### c.      Testimony of the Petitioner

The petitioner stated that he got along well with Claudia Broder.  (Tr. 2907).  He testified that he liked her and that she had never been angry or lost her temper with him despite problems that were occurring in the house at the time as between petitioner and his wife as well with Claudia's son.  (Tr. 2907).  The petitioner stated that he had conversations with Claudia on different subjects of his life and the problems he was having.  (Tr. 2906). Farino testified that they had spoke about his depression arising from the death of his brother; his problems with drug use; and problems he was having with his marriage to Claudia's daughter.  (Tr. 2906).  The petitioner went on to state that she also confided in him.  (Tr. 2906).

## II.    DISCUSSION

### A.    Standard of Review

The Antiterrorism and Effective Death Penalty Act (the "AEDPA") provides that a federal court may grant habeas corpus relief to state prisoners with respect to any claim that was adjudicated on the merits in state court proceedings only if the adjudication of that claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005) (discussing the federal habeas review standard set forth in Section 2254).  However, where the state appellate court has declined to reach the merits of a claim, federal habeas review is *de novo*.  *Fernandez v. Smith*, 558 F. Supp. 2d 480, 504 (S.D.N.Y. 2008).

### B.    As to Petitioner's Sufficiency of the Evidence Claim

A petitioner who challenges the sufficiency of the evidence supporting his conviction "bears a heavy burden."  *United States v. Griffith*, 284 F.3d 338, 348 (2d Cir. 2002) (citing *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir. 2001)).  To obtain habeas corpus relief, the Court must find that, when viewing the evidence most favorably to the prosecution, no rational trier of fact could find guilt beyond a reasonable doubt.

*Farrington v. Senkowski*, 214 F.3d 237, 240–41 (2d Cir. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

In addition, the Court must defer to the jury's determination of the weight given to conflicting evidence, witness credibility, and inferences drawn from the evidence. *United States v. Vasquez*, 267 F.3d 79, 90–91 (2d Cir. 2001) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S. Ct. 457, 86 L.Ed. 680 (1942) and *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998)). The Court's "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402, 113 S. Ct. 853, 861, 122 L. Ed. 2d 203 (1993). A federal habeas court must "credit every inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial." *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir. 1988).

In this case, the Appellate Division did not reach the merits of the petitioner's insufficiency of the evidence claim, finding instead that the claim was "unpreserved for appellate review." *People v. Farino*, 21 A.D.3d 427, 800 N.Y.S.2d 194 (2d Dep't 2005). In addition, the Court of Appeals denied petitioner's application for leave to appeal that order. *People v. Farino*, 5 N.Y.3d 852, 840 N.E.2d 141, 806 N.Y.S.2d 172 (2005) (table). Accordingly, the Court's review of the state court's decision is *de novo*.

### 1.    Preservation

The petitioner contends that his sufficiency of the evidence claim was preserved for appeal by his trial attorney's general motion to dismiss all charges. At Farino's trial, the defense twice made motions to dismiss the indictment. Defense counsel stated that there was insufficient evidence to sustain the charges in the indictment and that the prosecution failed to make a prima facie case that would require the case to be dismissed.  (Tr. 2719).  The court denied the motion made by the defense after the prosecution rested:

> Defense Counsel:  Judge, I would request a trial order of dismissal. I don't think there is evidence sufficient to sustain any of the charges in the indictment.
>
> The Court:  In other words, failure to make out a prima facie, is that what you're arguing?
>
> Defense Counsel:  Yes, Judge.
>
> The Court:  Ms. Tschiember.
>
> Ms. Tschiember:  I won't recite all the evidence.  The evidence speaks for itself.  The People feel there is adequate; in fact, there is more than adequate evidence of prima facie.  In fact, we think adequate evidence beyond a reasonable doubt.
>
> The Court:  Application for trial order of dismissal is denied.
>
> (Tr. 2719).

When the defense rested, it renewed the motion for dismissal based on insufficient evidence:

Defense Counsel: I'd renew the trial order of dismissal application I made previously.
(Tr. 3273).

The defense the went on to make closing arguments before the court

announced its ruling:

The Court: I don't know whether I had denied the renewal of the motion for a trial order of dismissal. I think…

Defense Counsel: I think you denied all the motions, Judge.

The Court: No, no. But the renewal today at the end of the entire case, that's denied.
(Tr. 3400).

In denying the petitioner's direct appeal under the rule announced in *People v.*

*Payne*, 3 N.Y.3d 266, 819 N.E.2d 634, 786 N.Y.S.2d 116 (2004), the Appellate Division

found that this motion was insufficient to preserve the issue now presented for review.

A federal court may not exercise habeas review if a state court judgment "rests on

a state law ground that is independent of the federal question and adequate to support the

judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640

(1991); *see also Fernandez*, 558 F. Supp. 2d at 489. Procedural default under state law

"constitutes an independent and adequate state ground that bars federal consideration of

the substantive claim on habeas corpus." *See Gonzalez v. Sullivan*, 934 F.2d 419, 421

(2d Cir. 1991). Accordingly, failure to comply with a state procedural rule, may preclude

the defendant from raising that claim in a federal petition for habeas relief. *Fernandez*,

558 F. Supp. 2d at 489.

Here, the rule in question is New York's contemporaneous objection rule, N.Y. Crim. Proc. Law § 470.05(2) (McKinney 1994), which provides that "an issue is preserved for appeal as a matter of law only when the appellant objected on that ground during the trial." *Fernandez*, 558 F. Supp. 2d at 489. To preserve for appellate review a challenge to the legal sufficiency of a conviction, "a defendant must move for a trial order of dismissal, and the argument must be 'specifically directed' at the error being urged." *People v. Hawkins*, 11 N.Y.3d 484, 492, 900 N.E.2d 946, 872 N.Y.S.2d 395 (2008).

The New York Court of Appeals has made clear that "general motions simply do not create questions of law for . . . review." *Id.* at 492, 900 N.E.2d 946, 872 N.Y.S.2d 395. A specific objection, "[alerts] all parties in a timely fashion to any alleged deficiency in the evidence, thereby advancing both the truth-seeking purpose of the trial and the goal of swift and final determination of guilt or nonguilt of a defendant" and allows the appellate courts to determine "legal issues of statewide significance" that have first been considered by trial courts. *Id.* at 493, 900 N.E.2d 946, 872 N.Y.S.2d 395. "Both the Supreme Court and the Second Circuit have held that the failure to object at trial when required by New York's contemporaneous objection rule . . . is an adequate and independent state ground" to deny habeas relief. *Rivera v. Ercole*, No. 07CV3577, 2007 WL 2706274, at *14 (S.D.N.Y. Sept. 18, 2007) (citing *Wainwright v. Sykes*, 433 U .S. 72, 86, 90, 97 S.Ct. 2497, 2506–08 (1977); *Murray v. Carrier*, 477 U.S. 478, 485–92,

497, 106 S.Ct. 2639, 2644-48, 2650 (1986); and *Franco v. Walsh*, 73 Fed. Appx. 517, 518 (2d Cir. 2003)).

In *Fernandez*, a recent habeas case relied on by the petitioner, the court concluded that the motion to dismiss was sufficiently specific, where trial counsel moved on the grounds that "the evidence was insufficient to support a conviction of depraved indifference murder." *Fernandez*, 558 F. Supp. 2d at 492. Further, Judge Chin explained that despite the trial court's description of the motion as "general in nature," the court actually treated the motion as being adequately specific to raise the issue of legal sufficiency and permit the court to "take any action that it deemed appropriate." *Id.* Judge Chin explained that "'perfect compliance with the state rule would not have changed the trial court's decision.'" *Id.* at 493 (quoting *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003)).

On the other hand, in *King v. Artus*, 259 Fed. Appx. 346 (2d Cir. 2008) (summary order), the Second Circuit upheld the district court's determination that trial counsel's motion to dismiss the intentional murder counts and general motion to dismiss all counts did not preserve a claim for insufficiency of the evidence with respect to the depraved indifference murder counts. *King*, 259 Fed. Appx. at 346–47. The court noted that counsel failed to direct his motion or any other objection specifically to the legal insufficiency of the evidence of depraved indifference murder. *Id.* at 347. Here, similarly, counsel's objection was not specifically directed to the sufficiency of the

evidence with respect to depraved indifference murder. Where, as here, a generalized motion fails to articulate any reason to dismiss a particular charge, sufficiency of the evidence is unpreserved. *Rivera*, 2007 WL 2706274, at *13 (finding counsel's "boilerplate" motion to "dismiss all of the charges against the defendant. . . . [o]n the grounds that the People have not proven his guilt beyond a reasonable doubt," insufficient to preserve petitioner's claim); *Cruz v. Conway*, No. 05CV4750, 2007 WL 1651855, at *5 (E.D.N.Y. June 6, 2007) (finding motion for a directed verdict based on the insufficiency of evidence of "the crimes charged" insufficient for preservation purposes); *Brito v. Phillips*, 485 F. Supp. 2d 357, 362–63 (S.D.N.Y. 2007).

In an even more extreme example, the *Hawkins* Court found unpreserved for review the defendant's argument that he acted with intent rather than recklessness and was therefore not guilty of depraved indifference murder. *Hawkins*, 11 N.Y.3d at 493, 900 N.E.2d 946, 872 N.Y.S.2d 395. Trial counsel objected that the prosecution "failed to prove that Mr. Hawkins acted with Depraved Indifference Murder." The Court found that such a motion, although invoking the depraved indifference count, "did little more than argue that the People failed to prove the essential elements of depraved indifference murder. The objection could have been directed at either the reckless mens rea element, or the objective circumstances evincing a wanton, depraved indifference to human life," but did not raise an "intentional killing" argument. *Id.* at 493, 900 N.E.2d 946, 872 N.Y.S.2d 395.

However, even in the event of a procedural default, courts have found cause to excuse the default because, given the evolving state of the law of depraved indifference during the last few years, trial counsel could often do no more than argue that the evidence was insufficient. *Fernandez*, 558 F. Supp. 2d at 493–94; *accord Brown v. Ercole*, No. 07CV11609, 2009 WL 857625, at *6 (S.D.N.Y. March 31, 2009). *But see Soto v. Conway*, 565 F. Supp. 2d 429, 436 (E.D.N.Y. 2008) (distinguishing *Fernandez*). Further, in *Fernandez*, Judge Chin found that because the conviction could not stand, the petitioner adequately established both prejudice resulting from the default sufficient to justify habeas review, and that a failure to address the claim would result in a manifest injustice. *Fernandez*, 558 F. Supp. 2d at 494. Nonetheless, where the evidence is sufficient to support the conviction, "no prejudice could have resulted from . . . trial counsel's failure to preserve the issue for appeal." *Holley v. Phillips*, No. 03CV1852, 2008 WL 2938043, at *5 (E.D.N.Y. July 28, 2008).

Here, although likely unpreserved, even if the petitioner's sufficiency of the evidence claim is amenable to habeas review, as explained below, it is without merit.

### 2.     The Law of Depraved Indifference

New York's depraved indifference murder statute, N.Y. Penal Law § 125.25(2), provides that a person is guilty of murder in the second degree when:

> Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person . . . .

At the time of Farino's conviction on April 4, 2002, the applicable law of depraved indifference murder in New York was based upon the Court of Appeals articulation of the rule in *People v. Register*, 60 N.Y.2d 270, 457 N.E.2d 704, 469 N.Y.S.2d 599, and *People v. Sanchez*, 98 N.Y.2d 373, 77 N.E.2d 204, 748 N.Y.S.2d 312 (2002).

In *Register*, the New York Court of Appeals held that shooting an individual at close range in a crowded bar-room could constitute depraved indifference murder. The Court explained that the mental element (mens rea) required for depraved mind murder was "recklessness" and the act element (actus reus) was "engaging in conduct which creates a grave risk of death to another person." *Register*, 60 N.Y.2d at 276, 457 N.E.2d 704, 469 N.Y.S.2d 599. However, the Court stated that an additional element, "circumstances evincing a depraved indifference to human life," was also required. *Id.*, 457 N.E.2d 704, 469 N.Y.S.2d 599. The Court ruled that "the focus [or key] of the offense is not upon the subjective intent of the defendant, as it is with intentional murder . . . , but rather upon an objective assessment of the degree of risk presented by defendant's reckless conduct." *Id.* at 277–78, 457 N.E.2d 704, 469 N.Y.S.2d 599 ("The concept of depraved indifference was retained . . . not to function as a mens rea element, but to objectively define the circumstances which must exist to elevate a homicide from manslaughter to murder.").

Important to this case, with respect to an intoxication defense the *Register* Court explained that "[t]he only culpable mental state found in section 125.25 which defines depraved mind murder is recklessness; it is defined in subdivision 3 of section 15.05 (which prohibits evidence of intoxication to negative it) . . . ." *Id.* at 278, 457 N.E.2d 704, 469 N.Y.S.2d 599. While "intoxication evidence might under some unusual circumstances negative the intent of an intentional homicide although by virtue of the statute it would have no similar effect on the same act charged as done recklessly in a depraved mind murder . . . ." *Id.* at 279, 457 N.E.2d 704, 469 N.Y.S.2d 599.

In *Sanchez*, where the defendant reached around from behind a door and fired into an area where children were playing, shooting the decedent in the chest, the Court upheld a conviction for depraved indifference murder. The Court reaffirmed its holding in *Register* that depraved mind murder "focuses not on the subjective intent of the defendant, 'but rather upon an objective assessment of the degree of risk presented by defendant's reckless conduct.'" *Sanchez*, 98 N.Y.2d 373, 379–80, 748 N.Y.S.2d 312, 77 N.E.2d 204 (quoting *Register*, 60 N.Y.2d at 277, 469 N.Y.S.2d 599, 457 N.E.2d 704).

During the time of *Register* and *Sanchez*, it was not improper for "the trial court to let the jury decide whether defendants should be convicted of intentional [murder] or depraved indifference murder." *Archer v. Fischer*, No. 05CV4990, 2009 WL 1011591, at *12 (E.D.N.Y. April 13, 2009) (noting that during that period, the jury could "'reasonably have concluded that defendant's conduct was either reckless and depraved,

or intentional.'" (quoting *Sanchez*, 98 N.Y. 2d at 386, 748 N.Y.S.2d 312, 777 N.E.2d 204)).

Starting with *People v. Hafeez*, 100 N.Y.2d 253, 762 N.Y.S.2d 572, 792 N.E.2d 1060 (2003), the Court of Appeals embarked on a path that would change the definition of depraved indifference murder in New York and drastically restrict the cases in which it could apply. *See People v. Suarez*, 6 N.Y.3d 202, 844 N.E.2d 721, 811 N.Y.S.2d 267 (2005); *People v. Gonzalez*, 1 N.Y.3d 464, 807 N.E.2d 273, 775 N.Y.S.2d 224 (2004); *People v. Payne*, 3 N.Y.3d 266, 819 N.E.2d 634, 786 N.Y.S.2d 116 (2004); *People v. Hafeez*, 100 N.Y.2d 253, 792 N.E.2d 1060, 762 N.Y.S.2d 572 (2003).

In *Hafeez*, the Court of Appeals held that depraved indifference murder could not stand where following a confrontation with the victim at a bar several months earlier, the defendant and an accomplice plotted revenge, waited for the victim outside the same bar and them attacked him by fatally stabbing him in the heart. *Hafeez*, 100 N.Y.2d at 256–57, 792 N.E.2d 1060, 762 N.Y.S.2d 572. The Court stated that the attack "was a quintessentially intentional attack directed solely at the victim" and not the result of depraved indifference. *Id.* at 258, 792 N.E.2d 1060, 762 N.Y.S.2d 572.

In *Gonzalez*, the defendant shot the victim in the chest from six or seven feet away, and, while the victim was on the ground, shot him nine more times. *Gonzalez*, 1 N.Y.3d at 465, 807 N.E.2d 273, 775 N.Y.S.2d 224. In finding that the defendant was improperly convicted on depraved indifference murder, the Court held that "[t]he only

reasonable view of the evidence here was that defendant intentionally killed the victim by aiming a gun directly at him and shooting him 10 times at close range, even after he had fallen to the ground."  *Id.* at 467, 807 N.E.2d 273, 775 N.Y.S.2d 224 (noting that "a person cannot act both intentionally and recklessly with respect to the same result").  The Court stated:

> When a defendant's conscious objective is to cause death, the depravity of the circumstances under which the intentional homicide is committed is simply irrelevant.  Nor can the wanton disregard for human life inherent in every intentional homicide convert such a killing into a reckless one.

*Id.* at 468, 807 N.E.2d 273, 775 N.Y.S.2d 224.  The Court further stated that to amount to depraved indifference, the reckless conduct must be "so wanton, so deficient in a moral sense of concern, so devoid of regard for the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another."  *Id.* at 469, 807 N.E.2d 273, 775 N.Y.S.2d 224.

In *Payne*, the defendant, who had been drinking heavily, went to the home of a friend after the relationship had soured and shot him at point-blank range with a 12-gauge shotgun.  *Payne*, 3 N.Y.3d at 269, 819 N.E.2d 634, 786 N.Y.S.2d 116.  Reversing the defendant's conviction, the Court stated that:

> [D]epraved indifference murder may not be properly charged in the overwhelming majority of homicides that are prosecuted in New York.  While we have identified instances in which a killing could qualify as depraved indifference murder, a point-blank shooting is ordinarily not one of them.

*Id.* at 270, 819 N.E.2d 634, 786 N.Y.S.2d 116. "The use of a weapon can never result in depraved indifference murder when . . . there is a manifest intent to kill." *Id.* at 271, 819 N.E.2d 634, 786 N.Y.S.2d 116. The Court further explained that "it should be obvious that the more the defendant shoots (or stabs or bludgeons) the victim, the more clearly intentional is the homicide." *Id.* at 272, 786 N.Y.S.2d 116, 819 N.E.2d 634. "Absent the type of circumstances in, for example, *Sanchez* (where others were endangered), a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder." *Id.* at 272, 786 N.Y.S.2d 116, 819 N.E.2d 634.

In providing examples of "acts . . . that are directed against a particular victim but are marked by uncommon brutality – coupled not with an intent to kill . . ., but with depraved indifference to victim's plight," the Court recounted instances, as follows:

> where, without the intent to kill, the defendant inflicted continuous beating on a three-year-old child, fractured the skull of a seven-week-old baby, repeatedly beat a nine year old, or robbed an intoxicated victim and forced him out of a car on the side of a dark, remote, snowy road partially dressed and without shoes in sub-freezing temperatures.

*Id.* at 271–72, 819 N.E.2d 634, 786 N.Y.S.2d 116 (citations omitted).

Further, in *Suarez*, the Court of Appeals stated:

> [S]omeone who intends to cause serious physical injury does not commit depraved indifference murder because the intended victim dies. . . . Thus, one who acts with the conscious intent to cause serious injury, and who succeeds in doing so, is guilty only of manslaughter in the first degree. Otherwise, every intentional manslaughter would also establish depraved indifference murder-a result plainly at odds with the discrete classifications set forth in

> the statute. Since a defendant who intends to injure or kill a
> particular person cannot generally be said to be 'indifferent'-
> depravedly or otherwise-to the fate of that person, we underscore
> what we said in *Payne*: 'a one-on-one shooting or knifing (or
> similar killing) can almost never qualify as depraved indifference
> murder.'

*Suarez*, 6 N.Y.3d at 211–12, 844 N.E.2d 721, 811 N.Y.S.2d 267 (quoting *Payne*, 2

N.Y.3d at 272, 786 N.Y.S.2d 116, 819 N.E.2d 634).  The *Suarez* Court went to great

lengths to distinguish depraved indifference murder from intentional murder and

intentional or reckless manslaughter.  *Id.* at 208–16, 844 N.E.2d 721, 811 N.Y.S.2d 267.

> A defendant may be convicted of depraved indifference murder
> when but a single person is endangered in only a few rare
> circumstances. . . . First, when the defendant intends neither to
> seriously injure , nor to kill, but nevertheless abandons a helpless
> and vulnerable victim in circumstances where the victim is highly
> likely to die . . . .  Second, although we have reversed depraved
> indifference murder convictions in most cases involving isolated
> attacks, we have held that the crime is nevertheless established
> when a defendant-acting with a conscious objective not to kill but
> to harm-engages in torture or a brutal, prolonged and ultimately
> fatal course of conduct against a particularly vulnerable victim.

*Id.* at 212–13, 844 N.E.2d 721, 811 N.Y.S.2d 267 (noting that depraved indifference

convictions have also been upheld in "extraordinary cases," such as firing a gun at point

blank range without knowing whether the round was a "live" or "dummy" round).

With respect to reckless manslaughter, the Court noted that "[o]ftentimes it will

not be easy to determine whether a defendant's conscious objective was to kill or merely

injure a victim. . . ." and the additional requirement of depraved indifference "comprises

both depravity and indifference . . . ."  *Id.* at 214, 844 N.E.2d 721, 811 N.Y.S.2d 267.

The Court acknowledged that it "depart[ed] *slightly* from the *Register* formulation . . . [to] make clear that the additional requirement of depraved indifference has meaning independent of the gravity of the risk." *Id.* at 215, 844 N.E.2d 721, 811 N.Y.S.2d 267 (emphasis added).

Finally, in its 2006 decision in *People v. Feingold*, 7 N.Y.3d 288, 292, 852 N.E.2d 1163, 819 N.Y.S.2d 691 (2006), the Court of Appeals revisited the entirety of its depraved indifference murder jurisprudence and expressly overruled *Register* and *Sanchez*. In *Feingold*, the Court explained that:

> We say today explicitly what the Court in *Suarez* stopped short of saying: depraved indifference to human life is a culpable mental state. Our dissenting colleagues contend that this final step in the overruling of *Register* is unwarranted and unnecessary. Perhaps we would agree with that were it not for the setting in which the present case comes to us. In earlier cases (*Hafeez*, *Gonzalez*, *Payne*, *Suarez* ), we reversed depraved indifference murder convictions without having to discuss explicitly the question of mens rea. It was enough to say--and we said it repeatedly--that those defendants did not commit depraved indifference murder because depravity or indifference was lacking.
>
> Beginning with *Hafeez*, the *Register/Sanchez* rationale was progressively weakened so that it would no longer support most depraved indifference murder convictions, particularly one-on-one shootings or stabbings. . . .
> In *Suarez*, it was not necessary for us to state explicitly whether depraved indifference is a mental state (mens rea). In the case before us, however, the trial judge rendered his verdict in a way that requires us to address directly the question of mens rea.

*Feingold*, 7 N.Y.3d at 294, 819 N.Y.S.2d 691, 852 N.E.2d 1163.

These developments lead then-Chief Judge Kaye to observe that the changes to depraved indifference murder in New York have actually been two-fold: "[o]ver the last several years, there have been two distinct threads in our developing depraved indifference murder jurisprudence-only one of which effected an actual 'change' in settled precedent." *Policano v. Herbert*, 7 N.Y.3d 588, 605, 859 N.E.2d 484, 825 N.Y.S.2d 678 (2006) (Kaye, CJ., dissenting). This "dual-thread" interpretation has been adopted and analyzed by at least one other Judge in this District. *See Soto*, 565 F. Supp. 2d at 434. "The first tread relates to the improper application of the depraved indifference charge in cases where 'evidence of a manifestly intentional killing' exists and . . . was consistently applied in *Hafeez, Gonzalez, Payne,* and *Suarez*." *Id.* "The second thread . . . . involves the transformation of the incommodious 'depraved indifference' element of depraved indifference murder, which 'gradually and perceptibly changed from an objectively determined degree-of-risk standard (the *Register* formulation) to a mens rea'" beginning with *Hafeez* and ending with *Feingold. Id.*

### 3. The Law to Be Applied to Farino's Case

With respect to Farino's sufficiency of the evidence claim, "[the] Court must look to New York law as it existed at the time petitioner's conviction became final." *Archer*, 2009 WL 1011591, at *14. A conviction is final 90 days after the Court of Appeals denies leave to appeal. *Id.* A subsequent petition for a writ of error *coram nobis* does not alter the date of finality. *See, e.g., Diaz v. Kelly*, 515 F.3d 149, 152 (2d Cir. 2008); *Smith*

*v. McGinnis*, 208 F.3d 13, 16 (2d Cir. 2000).  Here, the Court of Appeals denied Farino's request for leave to appeal on October 27, 2005 and his conviction became final in January of 2006, after *Hafeez, Gonzalez, Payne*, and *Suarez*, but before the Court's decision in *Feingold*.  Accordingly, Farino unquestionably obtains the benefit, if any, of *Hafeez, Gonzalez, Payne*, and *Suarez*.

The petitioner contends that the rule of *Feingold* must nevertheless be applied to his case.  In this regard, he concedes that the Court of Appeals has held expressly that the cases in this line are not retroactive beyond direct appeal.  *See People v. Jean-Baptiste*, 11 N.Y.3d 539, 901 N.E.2d 192, 872 N.Y.S.2d 701 (2008); *Policano*, 7 N.Y.3d at 603, 859 N.E.2d 484, 825 N.Y.S.2d 678; *Fernandez*, 558 F. Supp. 2d at 497–502.

However, the petitioner contends that despite the result of the state retroactivity principles, federal due process and equal protection require retroactive application of *Feingold* to his conviction.  In particular, the petitioner contends that federal retroactivity principles apply whenever a state's highest court: (1) creates a new rule of substantive law; (2) that narrows the scope of an extant penal statute, and (3) is designed and intended to enhance the accuracy of the fact-finding process.  For this proposition, the petitioner relies entirely on cases interpreting the proper retroactive application of United States Supreme Court precedent, not retroactive application of state law.  *See Danforth v. Minnesota*, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008); *Whorton v. Bockting*, 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007); *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct.

2519, 159 L.Ed.2d 442 (2004). The petitioner has not provided the Court with any persuasive legal reason to apply *Feingold* retroactively in the manner that he seeks. *See Guzman v. Greene*, No. 06PR1456, 2009 WL 2019892 (2d Cir. July 14, 2009) (summary order) (declining to discuss effect of *Feingold* where petitioner's conviction became final before the Court's decision in *Feingold*).

In *Soto*, Judge Dearie explained that the decisions in *Hafeez, Gonzalez, Payne* and *Suarez*, brightening the line in which "twin-count" indictments could be submitted to a jury, "represent[] merely the application of New York law to new factual circumstances, . . . do not represent a change in the law and therefore may be considered upon collateral review." *Soto*, 565 F. Supp. 2d at 434. However, Judge Dearie further identified that it is with respect to the second thread, the change in the requisite mental element, that "post-*Sanchez* case law did not apply retroactively." *Id.* In this regard, Judge Dearie found:

> [I]f this Court is correct in distinguishing between the Court of
> Appeals' parallel jurisprudential threads regarding 'charging
> errors' and 'the depraved indifference element' of depraved
> indifference murder, a merits-based review of the instant petition-
> which is premised on the former thread-could also look to those
> decision that post-date the finality of petitioner's conviction as
> applications of existing law to new facts.

*Soto*, 565 F. Sup. 2d at 436

As the petitioner's reliance on *Feingold* focuses on its alteration of the mental element of depraved indifference murder (the second thread), new state law has been

created and nonretroactivity does not violate due process . *See Henry v. Ricks*, No. 07PR4178, 2009 WL 2424572, at * 5 (2d Cir. Aug. 10, 2009) (stating, on a depraved indifference murder petition for habeas review that under the circumstances "the Due Process Clause does not require the retroactive application of a new interpretation of a criminal statute by the New York Court of Appeal in our collateral review of a conviction."). The issue before this Court, then, is whether no rational juror could have found beyond a reasonable doubt that the petitioner was guilty of depraved indifference murder in light of the law in place at the time Farino's conviction became final, *Hafeez* through *Suarez*, and the evidence adduced at the trial.

### 4. Application to Farino's Case

Under the law at the time Farino's conviction became final and viewing the evidence in the light most favorable to the People, the Court concludes that a reasonable juror could have found the elements of depraved indifference murder satisfied beyond a reasonable doubt.

The petitioner contends that *Payne* and *Suarez* narrowed the scope of depraved indifference murder in a way that categorically excludes this one-on-one attack from the statute's reach. In particular, the petitioner contends that except in "rare" cases—circumstances that he contends are not applicable here—depraved indifference murder may not be charged, or sustained, in a one-on-one homicide.

All of the *post-Sanchez* cases relied on by the petitioner to support this contention were overturned because they each showed a mental state of intent, and no other. *People v. Gause*, 46 A.D.3d 1332, 848 N.Y.S.2d 495 (4th Dep't 2007) (reversing depraved indifference conviction and ordering a new trial on the count of intentional murder where the defendant repeatedly struck the victim's head with a metal pipe after the victim had been shot by an accomplice); *People v. Abar*, 42 A.D.3d 676, 838 N.Y.S.2d 739 (3d Dep't 2007) (finding intentional rather than reckless assault where defendant stomped on victims's head for over a five-minute period, despite attempts by others to restrain him and warn him that he was killing the victim); *People v. Hawthorne*, 35 A.D.3d 499, 826 N.Y.S.2d 147 (2d Dep't 2006) (10 blows to the head with a claw hammer and attempted strangulation manifested an intent to kill); *People v. Russell*, 34 A.D.3d 850, 824 N.Y.S.2d 684 (2d Dep't 2006) (stating that although the issue was unpreserved for review, punching victim in the eye 20 times was not reckless, but rather an intentional infliction of serious injury); *People v. Rodriguez*, 34 A.D.3d 1181, 824 N.Y.S.2d 536 (4th Dep't 2006) (defendant acted with intent where he shot the victim twice in the head, stabbed him six times in the abdomen, neck, and shoulder and struck him 13 times in the head with a hammer, and then abandoned him in a burning house).

Significantly, here, any claim that the petitioner acted with intent to kill may properly be negated by the overwhelming evidence of his drug and alcohol intoxication. In *Policano v. Herbert*, the victim, Terry Phillips, became upset after observing his

girlfriend talking to the defendant in front of her apartment building. *Policano*, 7 N.Y.3d 588, 590, 859 N.E.2d 484, 825 N.Y.S.2d 678 (2006). Phillips struck the defendant on the head with a metal pipe, sending him to the hospital and the defendant threatened revenge. *Policano v. Herbert*, 507 F.3d 111, 112 (2d Cir. 2007). Six days later, at a nearby bus stop, Phillips was shot at close range, three times in the head and neck and once in the leg, killing him. *Id.* At the trial, an eyewitness who was familiar with both Policano and Phillips identified Policano as the shooter, on the basis of his presence at the scene and his clothing. *Id.* Two other witnesses described the shooter as a slender, dark-skinned black-man, which description Policano did not fit. *Id.*

Over objection of the defendant, the court instructed the jury on depraved indifference murder and the jury convicted him on that count, without rendering a verdict on the intentional murder count. *Id.* at 113. The Appellate Division affirmed the conviction, finding that viewing the evidence in favor of the prosecution, it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. *Policano*, 7 N.Y.3d at 593, 859 N.E.2d 484, 825 N.Y.S.2d 678. The Court of Appeals denied Policano's application for leave to appeal and his conviction became final on June 28, 2001, before even the Court's decision in *Hafeez*. *Id.* at 593, 859 N.E.2d 484, 825 N.Y.S.2d 678.

The United States District Court for the Eastern District of New York granted Policano's habeas petition as "largely indistinguishable" from *Gonzalez*, decided well

after the defendant's conviction was final. *Id.* at 594, 859 N.E.2d 484, 825 N.Y.S.2d 678.

The Second Circuit affirmed, concluding that *Gonzalez* and *Payne* "represented not the

creation of a new legal principle, but the application of long-settled New York law to

new facts." *Policano v. Herbert*, 430 F.3d 82, 87 (2d Cir. 2005) *withdrawn and*

*superseded*, 507 F.3d 111, 117 (2d Cir. 2007); *Policano*, 7 N.Y.3d at 593, 859 N.E.2d

484, 825 N.Y.S.2d 678 (internal quotations and citations omitted). However, before the

mandate issued, on June 21, 2006 the Circuit issued a split decision declining

reconsideration en banc. *Id.* at 594, 859 N.E.2d 484, 825 N.Y.S.2d 678. At the same

time, the original three judge panel certified three questions to the New York Court of

Appeals, principally asking whether at the time the petitioner's conviction became final

in 2001, "where the evidence produced at trial indicated that if the defendant committed

the homicide at all, he committed it with the conscious objective of killing the victim,

would a jury be permitted to find that the elements of depraved indifference murder were

satisfied beyond a reasonable doubt?" *Policano*, 507 F.3d at 114.

      The Court of Appeals responded that at the time the defendant's conviction was

final, it was *Register* that governed the legal sufficiency of evidence needed to establish

depraved indifference murder. *Id.* The Court of Appeals further explained that:

> [I]t has *never* been permissible in New York for a jury to convict a
> defendant of depraved indifference murder where the evidence . . .
> produced at trial indicated that if the defendant committed the
> homicide at all, he committed it with the conscious objective of
> killing the victim. . . . [U]nder *Register*-and until we started to
> recast "under circumstances evincing a depraved indifference to

> human life" post-*Sanchez*- where both intentional and depraved
> indifference murder were charged in one-on-one shootings or
> knifings, these counts were submitted to the jury for it to sort out
> the defendant's state of mind unless there was absolutely no
> evidence whatsoever that the defendant might have acted
> unintentionally.

*Policano*, 7 N.Y.3d at 600–01, 859 N.E.2d 484, 825 N.Y.S.2d 678 (emphasis added).

Further, the Court noted that "there is no doubt that under the law of New York today, a

jury would not be permitted to find defendant guilty of depraved indifference murder on

the evidence in this record." *Id.* at 601, 859 N.E.2d 484, 825 N.Y.S.2d 678.

Upon receiving these answers, the Second Circuit stated that it was not

convinced, despite the evidence relating to drug use, a shot in the thigh, and other

circumstances of the crime, that the record, as it stood at the time of the court's initial

decision, was sufficient to find that the defendant might have acted unintentionally.

*Policano*, 507 F.3d at 116.   However, the court explained that a re-reading of the trial

record revealed in addition to the evidence of Policano's crack usage prior to the killing,

he had been at a methadone clinic the afternoon of the incident, and that late the same

day he used "three of four bags" of heroin and consumed some alcohol that night.   *Id.*

The court concluded that "[i]n light of this testimony, in addition to the well-accepted

principle of New York penal law that voluntary intoxication can negate the *mens rea* of

intent but not recklessness . . . we cannot say that no rational juror could have found

beyond a reasonable doubt that Policano acted unintentionally." *Id.* at 116–17 (noting

that a record supporting conflicting inference must be presumed resolved in favor of the prosecution).

Here, the evidence produced at trial established that the defendant spent the entire previous evening and part of the morning consuming cocaine, marijuana, and alcohol prior to attacking his mother-in-law. This evidence presents a conflicting inference with evidence of an intent to kill. As it has always been and continues to be the law in New York that intoxication can negate intent, the Court finds that nothing in the *post-Sanchez* case law would change the result in this case.

In addition, unlike *Policano*, this case has an additional element that could lead a reasonable jury to believe that the defendant did not intend to cause death. A severe beating, unlike repeated shooting or stabbing (or in some cases, both), is not certain in all circumstances to cause death. Although the medical examiner testified that Claudia may have been struck "20 times or more," it is not known exactly how many times the victim was struck by the defendant. This is not a case where the "only reasonable view of the evidence . . . was that defendant intentionally killed the victim." *People v. Gonzalez*, 1 N.Y.3d at 467, 775 N.Y.S.2d 224, 807 N.E.2d 273; *see also People v. Payne*, 3 N.Y.3d at 270, 786 N.Y.S.2d 116, 819 N.E.2d 634; *People v. Hafeez*, 100 N.Y.2d at 258, 762 N.Y.S.2d 572, 792 N.E.2d 1060. Instead, Farino's attack on his mother-in-law could be viewed as violent act committed while highly intoxicated and with a depraved indifference as to whether she lived or died.

Further, the evidence clearly showed that prior to that point, Farino and the victim maintained a good relationship, and there was no evidence of a dispute developing prior to the killing. This fact raises an additional inference that Farino's conduct was reckless and indifferent as to the life of Claudia Broder, but that he did not intend to cause her death. *See Archer*, 1011591 at *14, 16 (finding the absence of any personal dispute between petitioner and decedent to be additional support for the position that the petitioner was indifferent about who, if anyone, was in a car with the decedent when firing randomly into the vehicle).

Based upon the confluence of these circumstances, the Court cannot say that no rational juror could have found that Farino acted without intent to kill, but instead with circumstances giving rise to a depraved indifference for human life.

The petitioner relies heavily on the mens rea portion of the *Feingold* decision. The petitioner contends that *Feingold*'s explicit inclusion of "depraved indifference" as the mental element of the offense - that the defendant was consciously aware of the natural and probable consequences of his acts - precludes a finding of knowing, but depraved, indifference in this case. In particular, Farino contends that the change in the law under *Feingold* allows for an intoxication defense to depraved indifference murder, so that the petitioner should have been permitted to argue that he was so intoxicated or so suffered from an extreme emotional disturbance that he was unaware of the likely consequences of his acts.

The New York Court of Appeals has recognized that:

> [I]ndividual judges hold differing views as to where along this trajectory [from *Hafeez* to *Feingold*] a majority of the Court may have effectively passed the point of no return-the limit beyond which, hard as we may have tried, it was simply not possible to reconcile our developing case law with *Register* and *Sanchez*. There is no doubt, however, that a majority of the Court explicitly overruled *Register* and *Sanchez* in *Feingold*, holding that 'depraved indifference to human life' is a culpable mental state.

*See Policano v. Herbert*, 7 N.Y.3d at 603, 859 N.E.2d 484, 825 N.Y.S.2d 678; *Soto*, 565 F. Supp. 2d at 433 (E.D.N.Y. 2008) (stating that "although the [*Policano*] Court found that the change in the depraved indifference element of the crime should not be applied retroactively, it declined to identify precisely when between *Hafeez* and *Feingold* the law actually passed 'the point of no return'"); *but see People v. Baptiste*, 51 A.D.3d 184, 192–95, 853 N.Y.S.2d 719 (3d Dep't 2008) (finding that the Court's decision in *Payne* marked the point at which the requisite mental state was converted from "recklessness" to "depraved indifference").

As discussed above, the petitioner is outside of the Court's holding in *Feingold*. Accordingly, the Court finds that at the time of his conviction "depraved indifference," though certainly a required element of the crime, was not the necessary mental element. Thus, at the time Farino's conviction became final, intoxication was generally unavailable as a separate defense to depraved indifference murder. *See Policano*, 507 F.3d at 116–117. The petitioner's claim that the evidence was insufficient to convict him of depraved indifference murder is denied.

**C.      As to Petitioner's Ineffective Assistance of Counsel Claim**

Petitioner was represented on  appeal by Richard J. Barbuto, Esq.  In that appeal,

Barbuto argued three grounds upon which the petitioner should be granted relief, but

chose not to raise an objection pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct.

1712, 90 L.Ed.2d 69 (1986).  After this initial appeal was denied, Farino filed a *coram

nobis* petition, claiming that he was denied effective assistance of appellate counsel.

**1.      Standard of Review for Ineffective Assistance of Counsel Claims**

To establish a claim of ineffective assistance of counsel, the petitioner must

demonstrate: (1) that "counsel's representation fell below an objective standard of

reasonableness;" and (2) that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  *Strickland

v. Washington,* 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In applying

this two-prong test, "judicial scrutiny of counsel's performance must be highly

deferential" and " a court must indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance."  *Id.* at 689, 104 S.Ct. 2052,

80 L.Ed.2d 674.  The relevant inquiry focuses "on fundamental fairness of the proceeding

whose results are being challenged."  *Id.* at 696, 104 S.Ct. 2052, 80 L.Ed.2d 674.

The petitioner bears the burden to "overcome the presumption that, under the

circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*, 46

U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.  The Supreme Court has required that

"every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 669, 104 S.Ct. 2052, 80 L.Ed.2d 674.

The test set forth in *Strickland* applies to both trial attorneys as well as appellate counsel. *Covington v. Lord*, 275 F.Supp.2d 352, 356 (E.D.N.Y. 2003) ("Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective assistance of appellate counsel."). However, the articulation of the second prong differs slightly in that "the petitioner must establish that 'there was a reasonable probability that [his] claim would have been successful before the [state's highest court].'" *Tung v. Fischer*, No. 01CV3877, 2003 WL 22999662, at *9 (E.D.N.Y. dec. 22, 2003) (quoting *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

An appellate attorney who files a brief on the merits of a criminal appeal need not raise every non-frivolous claim, but rather may select from among them in order to maximize the likelihood of success. *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (citing *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). A petitioner may establish constitutionally inadequate performance only if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker. *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). It is not enough to

simply prove that appellate counsel failed to raise one possible, non-frivolous claim.

*Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987.

2.    **Applicable Law for *Batson* Challenges**

It is well established in both civil and criminal law that while conducting voir

dire, an attorney may not use peremptory challenges in a manner that would discriminate

against otherwise unbiased prospective jurors based solely on their race.  *Powers v. Ohio*,

499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (citing *Batson v. Kentucky*, 476

U.S. 79, 84, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986)).  Every defendant has a right "to be

tried by a jury whose members are selected pursuant to nondiscriminatory criteria."

*Batson*, 476 U.S. at 85–86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (citing *Martin v. Texas,* 200

U.S. 316, 321, 26 S.Ct. 338, 50 L.Ed. 497 (1906)).  When a *Batson* challenge is raised,

the Court undertakes a three-step analysis to determine whether the peremptory

challenges have violated the Equal Protection Clause of the Fourteenth Amendment.

*Sanchez v. Phillips* No. 08PR0945, 2009 WL 1740504 at *3, (2d. Cir. June 19, 2009).

> First, the defendant must establish a *prima facie* case of discrimination.
> Second, the prosecutor must offer an explanation for the strike that is, on
> its face, race-neutral.  Third, the trial court must determine whether the
> defendant has carried her burden of proving that the government's
> proffered reason was pretextual, and that the strike was indeed motivated
> by purposeful discrimination.

*Id.* (citing *United States v. Brown*, 352 F.3d 654, 660 (2d. Cir. 2003)); *Batson*, 476 U.S.

at 97–98, 106 S.Ct. 1712, 90 L.Ed.2d 69.

At the outset, the Court notes that "Under the Equal Protection Clause, a criminal defendant may object to race-based exclusions of jurors through peremptory challenges *whether or not* the defendant and the excluded jurors share the same race." *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411.

The first inquiry to be addressed is whether there is a *prima facie* showing of discrimination. The Second Circuit has ruled that a *prima facie* showing can be made "by offering a wide variety of evidence, so long as the sum of the proffered facts gives rise to an inference of discriminatory purpose." *Brown v. Alexander*, 543 F.3d 94, 101 (2d Cir. 2008) (quoting *Johnson v. California*, 545 U.S. 162, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005)). The moving party is not required to prove discrimination at the first stage. *Id.* Once the defendant has established a *prima facie* case, the "burden shifts to the [non-moving party] to come forward with a neutral explanation for challenging [minority] jurors." *Batson*, 476 U.S. at 96, 106 S.Ct. 1712, 90 L.Ed.2d 69.

This second inquiry into a *Batson* challenge deals with the specific explanation offered by the State, and whether the explanation is, on its face, race-neutral. *Sanchez*, 2009 WL 1740504 at *3–4. The Supreme Court has opined that a "neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). The Court emphasized that "the explanation need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 at 97, 106 S.Ct. 1712, 90

L.Ed.2d 69.  In other words, "unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."  *Hernandez*, 500 U.S. at 360, 111 S.Ct. 1859, 114 L.Ed.2d 395.

The third and final step of the inquiry into a *Batson* challenge is that the court must determine whether the defense has proven purposeful discrimination on the part of the prosecution despite its offered explanation.  *Batson*, 479 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69; *Hernandez*, 500 U.S. at 359, 111 S.Ct. 1859, 114 L.Ed.2d 395; *Messiah v. Duncan*, 435 F.3d 186, 198 (2d. Cir. 2006).  In order for the court to grant a *Batson* claim despite a prosecutor's explanation, the court must conclude that even if "the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law."  *Messiah,* 435 F.3d at 198.  Demonstrating that the challenged voir dire process resulted in a racially discriminatory impact is not enough; meeting this standard requires proof of discriminatory intent or purpose.  *Id.* (citing *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).  Put in other words, at the third step of this inquiry, the trial judge must determine "whether counsel's race-neutral explanation for a peremptory challenge should be believed," although the burden remains with the defense. *Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859, 114 L.Ed.2d 395; *Messiah*, 435 F.3d at 195; *McKinney v. Artuz*, 326 F.3d 87, 98 (2d Cir. 2003).

Once a trial court has issued a ruling that the defense's burden has not been met, and that the prosecutor has exercised the peremptory challenges without discriminatory intent, "that finding may not be disturbed on appeal unless it is clearly erroneous." *Brown*, 352 F.3d at 661, (citing *United States v. Franklyn,* 157 F.3d 90, 97 (2d Cir. 1998)). This gives deference to the fact that the trial judge is required to "adjudicate the credibility of the non-moving . . . party's race neutral explanations," and recognizes that the trial judge's finding "often turns on the judge's observations of prospective jurors and the attorneys during voir dire." *Messiah*, 435 F.3d at 198; *Brown*, 352 F.3d at 661 (citing *McCrory v. Henderson,* 82 F.3d 1243, 1248 (2d Cir. 1999)).

### 3. Application of Law to Farino's Case

There is no question that the petitioner's defense counsel established a prima facie case of discrimination by the prosecution during voir dire. The defense raised the *Batson* challenge after the prosecution peremptorily challenged a prospective black juror. The defense's arguments established a pattern of dismissing a specific group of individuals.

> Defense Counsel: Yes. In addition, some [black jurors] left for cause for different reasons, that's not what I'm dealing with. Ms. Murray would be one on this panel. Mrs. Cochran would be another one on this panel. Margaret Armstrong would have been on yesterday's panel in seat three. And in addition to that, she challenged Mr. Divine who was a black male. I think out of the six or seven, adding this up, she challenged six out of seven, peremptorily. People with varying experiences, different levels of education, different life experiences; married people, single people, civil servants, college educated, master degrees. Their common element seems to be their race and their gender.

Ms. Tschiember: If I can respond? First of all.

The Court: You have to.

Ms. Tschiember:  He's completely incorrect because we have two jurors and they're both black.  How could I have challenged six out of the seven when the only jurors we have seated are black jurors.  I, obviously, didn't challenge those. . . .

(Tr. 358-369).

The Second Circuit has opined that all the defense must show to establish a prima facie case are circumstances that raise an inference of racial discrimination.  *Jordan v. Lefevre,* 206 F.3d 196, 200 (2d. Circ. 2000).  The Court has stated that such an inference may arise "from a pattern of strikes against minority jurors."  *Batson*, 476 U.S. at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69.  In *McCrory v. Henderson*, 82 F.3d 1243 (2d. Cir. 1996), the defense could not recall which jurors had been struck or what questions had been asked.  *McCrory*, 82 F. 3d at 1246.  However, the court found that the defense had "nonetheless established a prima facie case" of discrimination by recalling that "approximately" 3 out of the 4 prospective black jurors were peremptorily struck by the prosecution.  *Id.*  In petitioner's case, the defense raised the *Batson* objection after determining that a majority of prospective black jurors were peremptorily struck from the jury by the prosecution, with race as the only common characteristic among them. (Tr. 359). This pattern of juror strikes gave rise to a inference of racial discrimination.  The first step of the *Batson* inquiry was clearly established.

As discussed above, the second step of the *Batson* inquiry is whether the prosecution offered race neutral explanations for the peremptory strikes. This is the only burden the prosecution bears during the *Batson* analysis. In petitioner's case, the prosecution supplied her reasons as follows:

> Ms. Tschiember: I challenged Tanya Cochran because she has a brother convicted of selling and possessing controlled substance []. In addition, she had a financial problem. But right off the bat I prefer not to have relatives that have been convicted of felonies as part of my jurors.

> Ms. Tschiember: For the same reason I challenged Mr. Divine yesterday because he had also been convicted of a crime.
> . . . .

> Ms. Tschiember: With respect to Stacey Murray, I challenged her because of the fact that she has a degree in psychology, M.A. in psychology and she deals with psychological services. I challenged her for the same reason I challenge Mr. McGinn who's a white male, because he was also into that same milieu, that being studying, you know, counseling prisoners and ministering to prisoners.

> (Tr. 360–362).

> Ms. Tschiember: Mrs. Armstrong I just for some reason got uncomfortable feelings with her when I was talking to her and it was just bad vibes when I was speaking to her and I just feel that we didn't connect. I feel when she was passing by, she was not, you know--I just didn't particularly care for a look she gave me. There was something about that, you know.

> (Tr. 363).

> Ms. Tschiember: I challenged Mr. Colon for the following reason, in fact, I had it marked on my- - again, had nothing to do with his color. I challenged him because he came to court with a shirt on that was full of holes. I mean this is not just - - lot of people come in casual clothing but

he came in, I thought, with clothing that was inappropriate for a jury to come to a court because it shows a lack of respect.

(Tr. 364-365).

The Supreme Court has found that the prosecution must offer more of an explanation than a simple denial that the challenges were based on discrimination. *Batson*, 476 U.S. at 97–98. Although it is possible that a rational reason could still be a pretext for discrimination, that determination is considered in the third step of the inquiry. *Hernandez*, 500 U.S. at 363, 111 S.Ct. 1859. The prosecution in this case met that burden by articulating distinct reasons for each juror that the defense mentioned in its *Batson* challenge. Therefore, the second step of the inquiry was satisfied, and the trial judge went on to the third step.

The third step of the inquiry required the trial judge to assess the credibility of the prosecutor's proffered reasons, and to determine if the defense met its burden in proving purposeful discrimination on the part of the prosecutor. *Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69; *Jordan*, 206 F.3d at 200. The Second Circuit has stated in various cases that the trial court has a duty to articulate its finding as to the credibility of the prosecution's proffered reasons. *Jordan*, 206 F.3d at 200.

In Farino's case, the trial judge considered the credibility of each of the reasons offered by the prosecution, and gave explanations for his decisions. It should be noted that the challenge was also raised based on prospective juror Mr. Colon. The parties later

determined that Mr. Colon was Hispanic, not black, and therefore his being struck from

the jury was later excluded from the *Batson* challenge. (Tr. 368-370). Three of the

challenges were immediately deemed as having race neutral, non-pretextual reasons:

> The Court: Well, as far as the excuses given for Mr. Divine yesterday, and
> Mrs. Cochran today, namely: That either themselves were convicted of a
> crime or had a close relative convicted of a crime, I think that is a race
> neutral explanation.
>
> (Tr. 366-367).

> The Court: As far as challenge to the- - peremptory challenge to Ms.
> Murray, I conclude, based on what I heard, there was a race neutral reason
> and it was not pretextual. The request to have her seated is denied.

> The Court: Now, I'm troubled by "bad vibes." I never heard that one
> before. I'm not sure that's race neutral, that she didn't look at me when
> she passed me. I think that we might have to go a little deeper than that.
>
> (Tr. 366-367).

The prosecution offered a more detailed explanation as to why she challenged

Mrs. Armstrong, citing reasons such as "something about our interaction" and "you

choose jurors when you think they like you." (Tr. 370). The trial judge reiterated his

concern that "bad vibes" was not a race neutral reason for peremptorily striking a black

juror. (Tr. 372). Ultimately, the judge reviewed relevant case law and determined that

the reasons proffered for striking Mrs. Armstrong were also race neutral.

> The Court: ...when you boil it down, yes, it was race neutral, Ms.
> Tschiember's claim: I didn't like her. She didn't look me in the eye. I

had bad vibes.  When you analyze it, carefully, it would be race neutral.

(Tr. 388).

The trial court denied the *Batson* claim, finding that the defense did not meet the burden of proving purposeful discrimination on the part of the prosecution.  As discussed above, appellate courts are not to reverse such a ruling  "unless it is clearly erroneous." *Brown*, 352 F.3d at 661, (citing *United States v. Franklyn,* 157 F.3d 90, 97 (2d Cir. 1998)).  It is clear from the record that the trial judge in petitioner's case carefully reviewed the relevant case law and determined that there was no valid *Batson* claim.  The dialogue revealed that the trial judge took the *Batson* claim seriously and considered each of the challenged jurors raised in the challenge.  Specifically, the respect to Ms. Armstrong, the trial judge took time to review the district attorney's challenge and the Court does not find his resolution of the issue to be clearly erroneos.  The trial judge based his decision after witnessing the voir dire and observing the attorneys.  The final jury contained two members of the African American race.  (Tr. 391).  In fact, there is nothing in the record to indicate that an error was made at any step in the *Batson* inquiry, or that the jury panel that was ultimately selected was biased or unfair.

**4.      Application of Ineffective Assistance of Counsel law to Farino's case**

The petitioner in this case does not meet the two part test set out in *Strickland* for evaluating whether he received effective assistance of appellate counsel.  First, as there

was no clear error in the trial court's *Batson* analysis, there is no evidence that the appellate attorney's failure to raise the *Batson* claim "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 669, 104 S.Ct. 2052, 80 L.Ed.2d 674. On appeal to the New York Appellate Division, petitioner's attorney raised three claims: (1) whether the court erred when both the intentional murder and depraved indifference murder questions were submitted to the jury, given that the evidence pertaining to depraved indifference murder was legally insufficient; (2) whether due to prosecutorial misconduct, the petitioner was denied a fair trial; and (3) whether the petitioner was given an excessive sentence. *People v. Farino*, 21 A.D.3d 427, 800 N.Y.S.2d 194 (2d. Dep't 2005). These arguments focused on an important evolution in the law during that time and represented the petitioner's best chance for success on appeal.

The case law is clear. This Court must be "highly deferential" to counsel's performance, and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. There must be additional proof other than the fact that the appellate attorney did not put forth one of the non-frivolous claims. *Jones*, 463 U.S. at 754, 103 S.Ct. 3308, 77 L.Ed.2d 987. It appears as though petitioner's appellate counsel chose to raise the claims that he deemed most likely to be successful. There is no evidence that his choice not to raise the *Batson* claim was anything more than a strategy. A review of the underlying *Batson* challenge indicates that the trial judge made his

rulings carefully and consistently with the law. It is clear that petitioner does not meet the first prong of the *Strickland* inquiry.

Even if petitioner had proved that his attorney acted unreasonably, there is no evidence that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 669, 104 S.Ct. 2052, 80 L.Ed.2d 674. The fact that there were two black jury members on the trial jury demonstrates that African Americans in the jury pool were represented in the actual jury. Even if the *Batson* challenge had held more merit, there is still no reason to believe that the outcome for petitioner would have been different. As the analysis of the petitioner's *Batson* claim indicates, there is no evidence that the trial judge was wrong in his decision. Therefore, even if petitioner's appellate attorney had raised this issue on appeal, there is no evidence that he would have been successful. Accordingly, this Court concludes that petitioner did receive effective assistance of counsel from his appellate attorney at the time of his appeal.

### III.    CONCLUSION

Based on the foregoing, the Court finds that the state courts' determinations were not contrary to, or an unreasonable application of, clearly established federal law. Nor were they based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, the petition of Ralph Farino for a writ of habeas corpus is **DENIED**.

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2253(c)(2), a certificate of appealability is **DENIED**, as the petitioner fails to make a substantial showing of a denial of a constitutional right. *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
September 30, 2009

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge